UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

POLAR VORTEX, LLC,

    Plaintiff,

vs.

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON SUBSCRIBING TO POLICY
YHL1700840,

    Defendant.
_____/

## COMPLAINT FOR DAMAGES

Plaintiff, POLAR VORTEX, LLC ("Plaintiff" or "Polar Vortex"), herby sues Defendant, CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY YHL1700840 ("Defendant" or "Underwriters"), for damages arising from breach of a contract for marine insurance and in support thereof state as follows:

## JURISDICTION AND VENUE

1. This is an admiralty and maritime cause of action involving a policy of marine insurance and this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1333, as it involves a dispute regarding a maritime contract.

2. Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred within this jurisdiction and the vessel, which is the subject of the policy of insurance, is situated in Broward County, Florida.

3. This Court has specific personal jurisdiction over Underwriters, under Florida Statute § 48.193, as Underwriters (i) agreed to insure and adjust a claim for damage to a vessel located within the State of Florida; (ii) operated or conducted, engaged in or carried on a business in the State of Florida; (iii) breached a contract within the State of Florida by failing to perform acts required by the contract; and (iv) violated their fiduciary duties and duty of *uberrimae fidei* in the State of Florida.

4. This Court has general personal jurisdiction over Underwriters under Florida Statute § 48.193(2) as Underwriters engaged in substantial and not isolated activity within the State of Florida, including the placement and issuance of insurance policies to persons and property within the State of Florida, and exercising personal jurisdiction over Underwriters' comports with traditional notions of fair play and substantial justice.

5. All conditions precedent to the maintenance of this action have occurred, been waived or otherwise complied with.

## GENERAL ALLEGATIONS

6. Plaintiff, Polar Vortex, LLC, is a U.S. Virgin Islands limited liability company and the owner of the sailing vessel "Polar Vortex," a 2014 57' Fontaine Pajot catamaran sailing vessel bearing Hull Identification Number FPA 54031G314 (hereinafter, the "Yacht," "Polar Vortex" or "vessel").

7. Defendant, CERTAIN UNDERWRITERS AT LLOYD'S SUBSCRIBING TO POLICY YHL1700840, issued that certain Marine Yacht Insurance Policy No. YHL1700840 for Polar Vortex, effective from February 23, 2017 through February 23, 2018 (hereinafter referred to as the "Policy"). A copy of the Policy is attached hereto as **Exhibit "1."**

8. The Policy coverage included Hull & Machinery coverage (Agreed Value) of $1,000,000 and Protection & Indemnity coverage of $1,000,000.

9. The Policy issued by Underwriters is an All Risk Policy providing insurance coverage "against ALL RISKS of physical loss or damage to the property covered from any external cause."

10. Damage caused by Hurricanes and Windstorms are covered losses under the Policy.

11. The Policy Valuation Clause provides that the value of the Yacht is the amount stated on the Declarations Page as Agreed Value, to wit, $1,000,000.

12. The Policy provides that there shall be recovery for a Constructive Total Loss where the "expense of recovering and repairing the vessel exceeds the amount of insurance on hull and machinery."

13. The Policy deductible clause provides that the deductible amount shall not be applied in the event of a Total Loss or Constructive Total Loss.

14. The Policy provides that any dispute arising thereunder shall be adjudicated according to the well-established, entrenched principles and precedents of substantive United States Federal Admiralty law.

15. The doctrine of *uberrimae fidei* is an entrenched doctrine of United States Federal Admiralty law.

16. The *uberrimae fidei* doctrine is a reciprocal doctrine that places a duty of good faith on both the insured and the insurer requiring both parties to a marine insurance policy to accord the other the highest degree of good faith.

17. On September 5, 2017, the Polar Vortex was docked at her berth at Compass Point Marina, St. Thomas, U.S. Virgin Islands.

18. Between the dates of September 5th and 6th, 2017, Hurricane Irma struck the island of St. Thomas. During the hurricane, the Yacht broke loose from her mooring.

19. The Polar Vortex was blown by the wind until she became impaled on a piling. The piling entered the master cabin. The resulting hole caused by the piling was approximately six feet high and four feet wide. The port hull of the Polar Vortex became flooded with water and sank.

20. The Policy imposes upon the insured the responsibility to mitigate the loss and protect the vessel and its equipment following a loss in order to prevent further damage to the vessel. Failure to do so can result in loss of coverage under the policy.

21. Immediately following the loss, the insured took steps to safeguard the Yacht and mitigate the loss, in accordance with the "SUE AND LABOR" clause in Section "A" of the Policy. Using lift bags, the Yacht was raised and, thereafter, patched and preserved for Underwriters' inspection and acceptance of Tender of Abandonment.

22. Plaintiff hired Naval Architect Chad Blake of Nautical Consulting to salvage the Yacht.

23. The destruction around the Yacht and marina made it impossible to start recovery operations immediately. The earliest day to begin salvage was September 10, 2017.

24. The salvors found the Yacht in a complicated situation: all of the cleats were broken on Polar Vortex's starboard side, causing the Yacht to be forced by the winds across the marina.

25. Polar Vortex destroyed the dock and pilings, coming to rest with her port side sunken and a powerboat wedged between her and the pier.

26. Nautical Consulting sent a diver to investigate. The diver reported that he found a hole starting approximately one foot from the keel, which reached up past the waterline. The hole was discovered to have been caused by the intrusion of a large piling, still embedded in the seabed. The piling was attached to a steel bracket measuring 33" x 15." The top half of the piling was still inside the Yacht's port cabin with the bracket causing pressure on the Yacht's hull.

27. On the second day of the salvage, the salvors used four lift bags to float the Yacht, however, they discovered that they could not raise the Yacht until the piling and bracket were removed and the hole covered. The salvors encountered difficulties removing the piling from the interior of the Polar Vortex.

28. On the third day of the salvage operation, the piling was removed after cutting the fiberglass hull.

29. During the fourth day of the operation, the salvors used lines from the mast to the dock across the marina, lines on the winch, and full air in the lift bags in an attempt to move the Yacht away from the piling. The salvors placed a fifth lift bag on the bow to assist in floating the Yacht, however, the vessel resisted any floatation because it was deep in the mud, which created suction. Finally, the salvors were able to shift the Yacht far enough away from the piling that they could begin sealing the Yacht.

30. During the fifth day, the owner and the Yacht's captain assisted the salvors by helping them find the best materials available to patch the hole in the Polar Vortex as stores were still closed due to the hurricane.

31. Due to the limited resources available, the salvors patched the hole to the best of their abilities and then proceeded to pump the water out of the Yacht. The hole was measured at approximately 60" high x 44" wide at its widest point, and 22" wide at its narrowest. The large dimensions of the hole and the curvature of the hull made the sealing job extremely challenging.

32. During the sixth day of salvage operations a fiberglass sheet was screwed inside and filled with foam to make the structure stronger and to slow down the leaking. The Yacht was still floating with manageable leaking.

33. Polar Vortex and her captain requested the salvors to get Vessel back floating on her own again while limiting her time under water to minimize the damage.

34. In order for the vessel to remain afloat, daily pump-outs of water were necessary.

35. The salvors billed Plaintiff $69,665 for salvage and water pumping services of the vessel until October 3, 2017.

36. Defendant did not arrange to have a surveyor present during the salvage operations. Underwriters' surveyor did not arrive until September 27, 2017, 22 days after Hurricane Irma struck the island and 11 days after salvage operations concluded.

37. Underwriters' surveyor did not conduct a thorough survey of the Yacht. The only report issued by the surveyor was labeled Preliminary Damage Report. At that time, the "Vessel [was] afloat with large patch to port bilge pumping for 1 minute every 3 minutes." No final or comprehensive report was issued.

38. Nonetheless, the cursory inspection conducted by Underwriters placed them on notice that the Yacht was a total loss. "The Port engine room & electrical room submerged. Water heater, engine, 2 A/C pumps, battery, 2 inverters/chargers, 230V & 110V breaker panel, 24V breaker panel and wiring all submerged; Port hull completely submerged to 55" above cabin

sole. Port aft cabin shows patch over hole from above keel to mid height on topsides. Still leaking slowly. Interior totally destroyed. Head with 24V Techa toilet, all systems in bilges, mattress, cabinetry, linings, lights all wet. Port hull forward cabin shows conditions similar to aft cabin described [above]. Air handlers in both port cabins submerged."

39. The Preliminary Damage Report issued by Underwriters' surveyor coupled with the finding that Polar Vortex was submerged with a five foot by three and a half foot hole placed Underwriters on notice that the Yacht could not be restored to its pre-loss condition within the policy limits.

40. Underwriters, acting in good faith, should have acknowledged that the expense of recovering and repairing the vessel to its pre-loss condition exceeded the amount of insurance on the hull and machinery and declared the Yacht a total loss at that time. They failed to do so.

41. Polar Vortex, relying upon Underwriters' representation that the Yacht was repairable within the policy limits, transported the vessel to Fort Lauderdale, Florida for repairs as St. Thomas did not have a suitable repair facility. When the Yacht arrived in Fort Lauderdale, it was taken to Lauderdale Marine Center.

42. The cost of salvage, temporary repairs to prevent further damage, and to transport the vessel to Fort Lauderdale for full repair was $150,665.66.

43. Underwriters hired Miami marine surveyor Neil Maclaren to survey the Vessel when it arrived in Florida. Mr. Maclaren was not instructed to perform a Damage Survey nor did Mr. Maclaren issue a Damage Survey.

44. Instead of performing the usual and customary tasks of a marine loss surveyor of assessing origin, cause, nature and extent of damage, Mr. Maclaren undertook the role of an adjuster.

45. Mr. Maclaren adjusted the claim using the repairer's estimates and invoices rather than performing a good faith independent Damage Survey. Underwriters never requested a Damage Appraisal from Mr. Maclaren.

46. As repairs progressed, Underwriters' surveyor, Maclaren, noted that the method of construction of the Yacht would increase the repair cost such as:

   a. "the engine room longitudinals which were not tabbed into the hull and so allowed water to migrate into the core material of the engine longitudinals,"

   b. "hull laminate was drilled to allow through hull fittings to be installed the core was not sealed when the through was fitted and again water has migrated into the core."

   c. "wiring runs could not be accessed without taking down the whole headliner."

47. These and other construction issues did not manifest before the storm and did not cause any damage to the vessel.

48. Despite the fact that the construction issues did not result in damage to the Yacht before the storm nor otherwise interfere with the seaworthiness or safe use of the Yacht, Underwriters, in direct contravention of its Policy of Insurance, denied repair costs resulting from water intrusion into the core as a result of storm related submersion.

49. In other instances, Underwriters, in a conscious effort to avoid declaring the Yacht a constructive total loss, refused to consider in its loss calculations other alleged defects that are not excluded by the Policy.

50. Underwriters also improperly prorated certain necessary repairs and expenses required to restore the Yacht to its pre-loss condition despite the absence of any provisions of the Policy of Insurance permitting proration.

51.     Underwriters' provided coverage to Plaintiff using a standardized form labeled as the R12 or the "American Yacht Form," which has been used in the London Market for decades. The R12 contains standard exclusions.  One of the R12 standard exclusions for "damage or expense directly or indirectly caused by or in consequence of faulty construction and/or improper design" was specifically deleted from the Policy and replaced by "but this insurance excludes loss or expenditure incurred in remedying a fault in design or construction or any cost or expense incurred by reason of betterment or alteration in design or construction."

52.     Underwriters' Policy of Insurance only excluded the cost of repairing the "faulty construction and/or improper design" (i.e., failure to tab the longitudinals or seal the drill holes); it did not exclude the consequential loss/expense associated with repairing core damage resulting from water intrusion caused by the failure to tab the longitudinals or seal the drill holes.

53.     Underwriters intentionally overlooked the fact that its policy of insurance lacked an anti-concurrent causation clause.  Since Underwriters' own policy of insurance did not exclude or limit damages resulting from hurricanes, the absence of an anti-concurrent causation clause prevented operation of any other exclusion such as faulty construction and/or improper design from limiting recovery.

54.     If Underwriters had complied with the reciprocal duty to treat Polar Vortex with the utmost good faith, Underwriters would have acknowledged the Yacht was a constructive total loss while it was in St. Thomas or when the Yacht arrived in Fort Lauderdale and was inspected by its surveyor Maclaren.

55.     The CONSTRUCTIVE TOTAL LOSS CLAUSE recited in its Policy of Insurance provides: "No recovery for a constructive total loss shall be had hereunder unless **the expense of recovering** and repairing the vessel shall exceed the amount of insurance on hull and

machinery." (emphasis added). Underwriters failed to consider the considerable salvage and "Sue and Labor" expenses incurred in recovering the Yacht into its calculation of a total loss at the outset of the claim in contravention of the CONSTRUCTIVE TOTAL LOSS CLAUSE.

56. On January 25, 2018, Polar Vortex asked Underwriters:

> "As you are aware, it has been months since we began the salvage/discovery/repair process on the Polar Vortex and a number of unanswered questions remain (thus I am including all of you on this email).
>
> We would like answers to the following questions as soon as possible:
>
> 1. "To date, we have expended roughly $255,000 on salvage, discovery and repair preparations (please refer to sheet 2 of the attached spreadsheet). Furthermore, we understand that, at a minimum, another $612,000 will be required to repair the hull/machinery. Rob Mitchell (copied here) has provided all of our paid invoices to date as well as repair estimates. When can we expect to receive reimbursement of the salvage/discovery/repair prep expenses? What are the next steps in the repair process? When will advances be made available? Of further note, we are rapidly approaching the insured limit of the hull and machinery. At what point will the vessel be declared a total loss?"

57. Underwriters never directly responded to the legitimate concerns of its insured, Polar Vortex, to whom Underwriters owed the Duty of Utmost Good Faith. Instead, Underwriters responded with double talk and deflection which was a denial of Polar Vortex's request to declare the Yacht a constructive total loss. Underwriters wrote:

> "The next steps in the repair process are that myself and the surveyor go through the repair quote to confirm that all items are related to the insured incident and then we will advise the repairers to proceed with the work. I appreciate there has already been some expense incurred by yourselves in getting to this stage and we can arrange for a payment on account (interim payment). Myself and the surveyor will review the current items already incurred then an interim payment can be made subject to a signed interim release."

58. In reliance upon the Defendant's position that the vessel was not a total loss, and in reliance upon the Defendant's surveyor as to the propriety of the repairs performed, Plaintiff continued with the repair process.

59. In early 2019, Maclaren estimated that the cost to repair the damage to the Yacht would exceed the policy limits of $1,000,000 and recommended a reserve of $1,050,000.

60. Notwithstanding the fact that Underwriters were apprised that the expense of recovering and repairing the Yacht exceeded the Agreed Value of the vessel, Underwriters failed to declare the Yacht a constructive total loss, as required by the Policy, and continued to refuse to declare a total loss under the Policy, notwithstanding the requests for same by Plaintiff.

61. The repair project was stopped by Plaintiff after having paid a total of **$1,241,894.47**, which consisted of **$1,091,228.81** in repairs to the Yacht and **$150,665.66** to salvage the Yacht, perform temporary repairs to prevent further damage and transport the vessel to Fort Lauderdale for repair.

62. The pre-loss market value of the Yacht was $1,000,000, for which it was insured.

63. At the time the repairs were stopped, they were far from complete. There was no interior installed on the port or starboard pontoons, no engine or other equipment in the engine room, no wiring, and the carpentry projects were only 25% completed.

64. When the repairs were stopped, the cost of repairs paid by Plaintiff had exceeded both the value of the Yacht and the agreed assured value under the policy, however, the repairs were only partially completed.

65. Polar Vortex submitted a Notice of Tender of Abandonment and Sworn Proof of Loss on June 17, 2019, which was rejected by Underwriters. See attached **Exhibit "2."**

66. A Notice of Tender of Abandonment is a procedural notice of relinquishment or unconditional surrender of all rights to a vessel by its insured owner to the insurer in the event of a constructive total loss.

67. Underwriters' Policy provides, "it is especially declared and agreed that no acts of the Insurer or Insured in recovery, saving or preserving the property insured shall be considered as a waiver or acceptance of abandonment."

68. The Plaintiff is now in possession of a partially repaired vessel for which it has paid over $1,200,000 to repair with estimates of approximately $450,000 to complete the repairs. If and when the repairs are completed, the vessel will have a fair market value significantly less than its insured value of $1,000,000. In other words, if repairs were to be completed, the insured will have expended $1,700,000 for a yacht worth significantly less than $1,000,000.

69. Underwriters exposed its insured to this financial loss by not recognizing and declaring the Yacht a Constructive Total Loss when it was first inspected in St. Thomas.

70. Had Defendant treated its insured with the utmost good faith, it would have declared the Yacht a constructive total loss and paid Polar Vortex the full $1,000,000 policy limits after the Yacht was first surveyed 22 days after the Hurricane. Instead, Underwriters substituted their own selfish motives to save money over its obligation to treat its insured with the utmost good faith.

71. Underwriters' surveyor, Maclaren, calculated the claim-related costs to date at $1,227,216.04 with $314,047.90 as the balance due the insured after deducting $863,168.14 already paid by Underwriters.

72. Maclaren's adjustment did not include improper prorations of shipyard storage fees totaling $101,337.07 into the balance owed the insured.

73. Had Maclaren included the prorations he improperly adjusted out of the claim, the balance of unpaid claim-related expenses would be $415,384.97.

74. Maclaren's adjustment did not take into account tender repairs, which had its own separate coverage under the Policy of Insurance.

75. Underwriters now concedes the Yacht is a constructive total loss, but accepts no responsibility for its failure to declare the Yacht a constructive total loss in a timely manner.

76. The condition of the Yacht did not change from the date when Underwriters' surveyor first examined the Yacht, but Underwriters failed to acknowledge the Yacht was a constructive total loss, until after the repairs were stopped.

77. Underwriters are unwilling to make its insured whole for Underwriters' bad decision to not originally declare the Yacht a constructive total loss when such was evident.

78. Plaintiff is now exposed to significant expense and financial loss as a result of Underwriters' failure to timely declare the Yacht a constructive total loss.

79. Plaintiff is continuing to preserve the Yacht for Underwriters for which it seeks reimbursement.

## COUNT 1 - BREACH OF CONTRACT
## FAILURE TO DECLARE CONSTRUCTIVE TOTAL LOSS

80. Plaintiff adopts and re-alleges the allegations contained in paragraphs 1-79 herein with the full force and effect thereof.

81. Defendant issued to the Plaintiff a marine insurance policy providing coverage for physical damage to the Yacht.

82. In September 2017, Plaintiff's vessel, "Polar Vortex," sustained physical damage resulting from Hurricane Irma.

83. Plaintiff reported the loss to Defendant and made a claim for benefits under the Policy issued by Defendant for physical loss and damage to the vessel.

84. The performance of an insurer's obligations under a policy of marine yacht insurance, such as the Policy Defendant issued to the Plaintiff, is governed by the entrenched maritime doctrine of *uberrimae fidei.*

85. Plaintiff has complied with all conditions under the Policy and has fulfilled its obligations under the Policy.

86. The marine insurance contract is *uberrimae fidei*: it is conceived in the utmost good faith and incubated in a legal environment which transcends the sharper practices of the world of commerce and places a duty of good faith on the insurer requiring an insurer to accord insured the highest degree of good faith in its dealings and fulfillment of its obligations under the policy.

87. Defendant breached the contract of insurance by failing, in good faith, to timely declare the vessel a constructive total loss resulting in the Plaintiff incurring repair expenses in excess of the policy limits, with the result that the vessel has not been restored to its pre-loss condition.

88. Had Defendant acted in good faith, it would have declared the Yacht a constructive total loss after the Hurricane and paid the policy limits without exposing its insured to the added expense for what is an empty shell of a yacht.

89. Defendant breached the contract of insurance by failing, in good faith, to properly adjust the claim by including salvage and sue and labor expense into hull repairs thereby reducing the amount available for repairs to the Yacht.

90. Defendant breached its obligations of good faith and fair dealing under the doctrine of *uberrimae fidei* in adjustment of the claim and dealings with the insured regarding the scope and extent of loss.

91. As a result of the breach of contract by Defendant, Plaintiff has suffered damages and continues to suffer damages including, but not limited to, the expense of restoring the vessel, storage for the vessel and legal fees.

WHEREFORE, Plaintiff seeks judgment against Defendant for failure to declare the Yacht a constructive total loss, including, but not limited to, an award of full policy limits to compensate Plaintiff for the losses sustained as a result of the Defendant's breach of contract without deduction for sums paid for repairs which would not have been incurred had Defendant timely declared the vessel a constructive total loss, salvage and preservation expense to date as well as actual, consequential, incidental and punitive damages, costs, attorney fees and prejudgment interest together with such other and further relief as may be just and proper.

### COUNT 2 - BREACH OF CONTRACT
### FAILURE TO PAY TENDER CLAIM

92. Plaintiff adopts and re-alleges the allegations contained in paragraphs 1-79 and 81-91 herein with the full force and effect thereof.

93. The Tender to the Yacht was damaged in the Hurricane.

94. The Policy of Insurance provides coverage and limits for the Tender.

95. Underwriters did not separately adjust the Tender damage.

96. As a result of the breach of contract by Defendant, Plaintiff has suffered damages and continues to suffer damages including, but not limited to, the expense of restoring the Tender, storage for the Tender and legal fees.

WHEREFORE, Plaintiff seeks judgment against the Defendant, including, but not limited to, an award of damages sufficient to compensate Plaintiff for the losses sustained as a result of the Defendant's breach of contract, costs, attorney fees and prejudgment interest together with such other and further relief as may be just and proper.

## COUNT 3 - BREACH OF DUTY OF UTMOST GOOD FAITH AND FAIR DEALING

97. Plaintiff adopts and re-alleges the allegations contained in paragraphs 1-79; 81-91 and 93-96 herein with the full force and effect thereof.

98. Defendant, as marine insurer, owes to Plaintiff the highest duty of good faith and fair dealing in the fulfillment of its obligations under the Policy and in its transactions with Plaintiff in the adjustment of any loss or claim under the Policy.

99. As marine insures, Defendant's dealings with Plaintiff were to be at all times governed by *uberrimae fidei* requiring Defendant to accord Plaintiff the highest degree of good faith in their dealings and fulfillment of their obligations under the Policy.

100. Plaintiff, as an insured under a policy of marine insurance, reasonably trusted and relied upon Defendant to deal with them in utmost good faith and to fairly and honestly communicate with them and appropriately adjust the claim, including timely declaring the vessel to be a total loss.

101. Defendant breached its duty of good faith and fair dealing by failing to truthfully and honestly communicate with the insured as to the scope of loss and damage to the vessel and in its adjustment of the claim.

102. Defendant breached its duty of good faith and fair dealing by failing, in good faith, to timely declare the vessel a constructive total loss which resulted in Plaintiff incurring repair expenses in excess of policy limits which did not result in restoring the vessel to its pre-loss condition.

103. Had Underwriters acted in good faith, they would have declared the Yacht a constructive total loss after the Hurricane and paid the policy limits without exposing its insured to the added expense for what is an empty shell of a yacht.

104. Defendant breached its duty of good faith and fair dealing by failing, in good faith, to properly adjust the claim by allocating salvage and sue and labor expense into hull repairs thereby reducing the amount available for repairs.

105. Defendant breached the duty of good faith and fair dealing by improperly adjusting the claim to exclude covered damages in an effort to prevent a timely declaration of a constructive total loss under the Policy.

106. As a result of Defendant's unfaithfulness in the adjustment of the claim, failure to communicate with Plaintiff in an honest and open manner as to the scope of loss, and the fact that the vessel was a constructive total loss which could not be returned to its pre loss condition, the Plaintiff incurred costs to repair the vessel that exceeded the policy limits and which have failed to restore the vessel to its pre-loss condition.

107. As a result of Underwriters' breach of the duty of good faith, the Plaintiff has suffered damages and continues to suffer damages including, but not limited to, the expense of restoring the vessel, storage for the vessel and legal fees.

WHEREFORE, Plaintiff seeks judgment against the Defendant, Underwriters, as follows:

i. Find the vessel was a constructive total loss as a result of the hurricane damage sustained by the vessel;

ii. Find Defendant's failure to deem the vessel a total constructive loss was a violation of their obligations under the doctrine of *uberrima fidei* entitling Plaintiff to an award of full policy proceeds without deduction for sums paid for repairs which should not have been incurred had the Defendant timely declared the vessel a constructive total loss in accordance with their obligations of utmost good faith;

iii. Require Defendant to accept the tender of abandonment of the vessel by Plaintiff in exchange for payment of full policy proceeds without deduction for sums paid for repairs which would not have been incurred had Defendant timely declared the vessel a constructive total loss in accordance with its obligations of utmost good faith;

iv. An Award of Damages, including direct, consequential and incidental damages, attorney fees, costs and prejudgment interest, sufficient to compensate the Plaintiff for the loss sustained as a result of Defendant's obligation of utmost good faith; and,

v. Such other and further relief as this Court may deem just and proper.

Dated this 29th day of September 2020.

Respectfully submitted,

FERTIG & GRAMLING
200 Southeast 13th Street
Fort Lauderdale, FL 33316
Tel. (954) 763-5020
Fax (954) 763-5412
*Attorneys for Polar Vortex LLC*

By: *s/ Christopher R. Fertig*
CHRISTOPHER R. FERTIG (218421)
Chris.fertig@fertig.com
Darlene M. Lidondici (516521)
dml@fertig.com